28 F.3d 114
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 WESTERN STATES CONSTRUCTION COMPANY, INC., a Wyoming
corporation, Plaintiff, Counter-Defendant, Appellant,
v.
The BOEING COMPANY, a Delaware corporation, Defendant,
Counterclaimant, Appellee.
WESTERN STATES CONSTRUCTION COMPANY, INC., a Wyoming
corporation, Plaintiff, Counter-Claim Defendant, Appellee,
v.
The BOEING COMPANY, a Delaware corporation, Defendant
Counterclaimant, Appellant.
 Nos. 93-1073, 93-1092.
 United States Court of Appeals, Tenth Circuit.
 July 8, 1994.
 
 1
 ORDER AND JUDGMENT*
 
 
 2
 Before KELLY and SETH, Circuit Judges and OWEN, District Judge**.
 
 
 3
 Appellant Western States Construction Company ("Western") commenced an action in the United States District Court for the District of Colorado seeking recovery of amounts due as a result of a contract termination and of other liquidated amounts allegedly due from Appellee The Boeing Company ("Boeing"). Boeing counterclaimed for monies allegedly owed by Western for the sale of certain equipment by Western. At the conclusion of the trial, the district court entered judgment in favor of Boeing in the amount of approximately $240,000.00. Western appeals, and Boeing cross-appeals.
 
 
 4
 In 1986 Western and Boeing entered into a "Teaming Agreement" under which they jointly developed an overall bid to be submitted to the United States Air Force for a project known as the Hardened Intersite Cable System, Phase II ("HICS II"). This project involved the excavation and reconditioning of the Air Force's underground electronic cable systems at six minuteman missile launch facilities, which were designated as Wings I-VI. According to the Teaming Agreement, Boeing was the general contractor, and Western was a subcontractor responsible for the excavation and backfill portions of the project.
 
 
 5
 After the Teaming Agreement was accepted by the Air Force, Boeing and Western entered into a formal subcontract. This was subsequently amended on January 14, 1988 by a Memorandum of Agreement ("MOA") which is the subject of this lawsuit. The MOA established a phased construction plan with projections that Wings II and III ("Basic Work") would be completed in 1988; Wings I and VI ("Option 1") would be completed in 1989, if Option 1 were activated by Boeing; and Wings IV and V ("Option 2") would be completed in 1990, if Option 2 were activated by Boeing.
 
 
 6
 It was understood by the parties that during construction Western would purchase equipment, e.g. backhoes, vehicles and rolling stock ("Vehicles"), for the particular phase of the project. Once that phase was completed, Western would move the Vehicles to the next site and combine them with newly acquired Vehicles for use in the next phase of construction. At all times Western held title to and insured the various Vehicles. After Western purchased a Vehicle, it would submit a request to Boeing for reimbursement. It appears that the amount of reimbursement had been previously negotiated as a fixed amount depending on the type of Vehicle purchased, regardless of the Vehicle's actual price.
 
 
 7
 Upon completion of the work detailed in the MOA, Boeing was entitled to a fixed credit of approximately $1.5 million for the money it had provided to Western for the purchase of the Vehicles. This credit was calculated by assessing a residual value to each type of Vehicle and summing together the residual values for all of the Vehicles that Western anticipated buying during the entire course of the project. Unfortunately, HICS II was not completed because the Air Force terminated the contract after Western had completed the first five Wings but before Western began excavating the last Wing of Option 2. As a consequence Boeing terminated the MOA for convenience which directly led to the primary dispute before this court: what is the precise credit owed to Boeing for the Vehicles purchased by Western?
 
 
 8
 For our purposes, the pertinent provisions of the subcontract and MOA are the Special Agreement on Vehicles ("Special Agreement") and sections 49.2 and 49.7 of the General Terms and Conditions. The Special Agreement on Vehicles provides:
 
 
 9
 "It is understood and agreed that the price of this subcontract includes an amount for Subcontractor's (Western States Construction) purchase of vehicles which will be used in performing this subcontract at Minuteman Operation Wings. At the conclusion of the subcontract, title shall vest in the Subcontractor. The Subcontract Price also includes recognition of a credit amount which takes into consideration Subcontractor's intent to sell the vehicles upon conclusion of their use on this subcontract.
 
 
 10
 "No further contractual action will be required as the resale amount due to Boeing has already been considered in the firm subcontract price in Option II, providing all options are activated. Should Options I and II not be activated, the credit will be subject to re-negotiation."
 
 Section 49.2 provides in relevant part:
 
 11
 "After receipt of a Notice of Termination and except as otherwise directed by Boeing, Contractor [Western] shall:
 
 
 12
 ....
 
 
 13
 "(f) transfer title and deliver to Boeing or the Government, in the manner, at the time and to the extent, if any, directed by Boeing, (1) the fabricated or unfabricated parts, work in process, completed work, supplies and other material produced as a part of, or acquired in connection with the performance of, the work terminated by the Notice of Termination ...;
 
 
 14
 "(g) use his best efforts to sell, in the manner, at the times, to the extent and at the price or prices directed or authorized by Boeing, any property of the types referred to in (f) above; provided, however, that Contractor (1) shall not be required to extend credit to any purchaser, and (2) may acquire any such property under the conditions prescribed and at a price or prices approved by Boeing, and provided further that the proceeds of any such transfer or disposition shall be applied in reduction of any payments to be made by Boeing to Contractor under this contract or shall otherwise be credited to the price or cost of the work covered by this contract or paid in such other manner as Boeing may direct...."
 
 Section 49.7 states:
 
 15
 "In arriving at the amount due Contractor [Western] under this clause there shall be deducted (a) all unliquidated advance or other payments on account theretofore made to Contractor, applicable to the terminated portion of this contract (b) any claim which Boeing may have against Contractor in connection with this contract and (c) the agreed price for, or the proceeds of sale of, any materials, supplies or other things kept by Contractor or sold, pursuant to the provisions of this clause, and not otherwise recovered by or credited to Boeing."
 
 
 16
 The district court determined that only section 49 was applicable because it specifically addressed termination for convenience. The court then held that Boeing was entitled to a credit for the full amount of the value received by Western from its auction of certain Vehicles. The court also held that Western must reimburse Boeing for $38,700.00, which represents the stipulated value of additional Vehicles retained by Western after the termination.
 
 
 17
 While the parties agree that Boeing is entitled to a credit, we have previously identified the primary issue presented on appeal as concerning the valuation of that credit. The parties also raise claims concerning the award of statutory interest for some claims and the denial of interest for others. We first direct our attention to the credit valuation issue.
 
 
 18
 The credit valuation issue presents questions of law regarding contract interpretation that we review de novo. Key v. Liquid Energy Corp., 906 F.2d 500, 505 (10th Cir.). There are numerous canons of contract construction that guide our review. First, contract terms should be interpreted according to their plain and generally prevailing meaning. Millers Mutual Ins. Ass'n v. Iowa Nat'l Mutual Ins. Co., 618 F.Supp. 301 (D. Colo.). In addition, a contract should be read in such a way as to give meaning to and harmonize every provision. Petition of First Interstate Bank of Denver, N.A., 767 P.2d 792 (Colo.App.). Most importantly, contract language should be construed against the party, in this case Boeing, who drafted it and selected the words that created the confusion or ambiguity. Green Shoe Mfg. Co. v. Farber, 712 P.2d 1014 (Colo.).
 
 
 19
 Boeing cites several decisions in its brief for the proposition that only the section 49 termination clause of the subcontract applies to this scenario because the MOA was terminated for convenience. However, none of these cases address the unique facts presented in this appeal, namely, that the Special Agreement specifically applies to the rights of the parties "[a]t the conclusion of the [MOA]." Western cites Salsbury Indus. v. United States, 905 F.2d 1518 (Fed. Cir.), in support of its contention that the "[i]nclusion of a termination for convenience clause in a contract does not, as a matter of law, write out' other provisions of the subcontract under which the terminating contractor is entitled to specific, post-termination sums." Appellant's brief at 16. While the holding of Salsbury neither supports nor detracts from Western's assertions, the reasoning of the court does indicate that, where applicable, all provisions of a contract should be examined upon termination even in the face of an express termination clause. We believe that this case presently before the court is the type of case in which the termination clause is not absolute but rather must be read in connection with other contract clauses and agreements.
 
 
 20
 There is no question that the Special Agreement provides that title to the Vehicles shall vest in Western at the "conclusion" of the MOA. Moreover, it is uncontested that both Options 1 and 2 were "activated" as required by the Special Agreement. The question then becomes: What is the meaning of conclusion? We find Boeing's attempt to interpret "conclusion" as "completion of work" to be strained and unpersuasive. Boeing is a sophisticated corporation that was fully capable of drafting the Special Agreement to specifically apply only upon the completion of all work by Western, yet Boeing chose the phrase "conclusion of the subcontract." We find that the more logical and readily apparent meaning of this phrase encompasses any "termination" of the subcontract. Consequently, we hold that when Boeing terminated the MOA for convenience, the subcontract was "concluded" as that term was used in the Special Agreement. Therefore, the district court erred by relying exclusively on the section 49 termination clause when it determined that Western must reimburse Boeing for the actual value of the Vehicles it auctioned or retained. We next turn our attention to the interplay between the Special Agreement and section 49.
 
 
 21
 The plain language of the Special Agreement indicates that it applies to Vehicles. Apparently, "Vehicles" is a generic term that describes the various pieces of equipment, rolling stock and vehicles that underlie this dispute. On the other hand, section 49.2(f) provides that Boeing shall be given title to "supplies and other material ... acquired in connection with the performance of, the work terminated" by Boeing. Boeing argues that this language reasonably is interpreted to include the Wing IV Vehicles in question. Again, we are not convinced by Boeing's interpretation of these ambiguous terms. Black's Law Dictionary, Fourth Edition, defines "supplies" in connection with building contracts as "things other than labor, which are consumed in, but do not become a physical part of, the structure and is distinguished from the word materials,' which are things becoming a physical part of the structure." This commonsense definition illuminates the critical fact that supplies and materials are either consumed or subsumed during construction. The same cannot be said of vehicles and other equipment. Unlike saw blades, drill bits, lumber and nails, the Vehicles were not intended to be nor in fact were they consumed or subsumed in Western's excavation and backfill operations.
 
 
 22
 Having determined that Vehicles are not supplies or materials, we must also determine if they are "other things" as that phrase is used in section 49.7. Boeing asserts that "other things" should be interpreted broadly to include the Vehicles at issue. If there were no Special Agreement on Vehicles, we would be inclined to accept Boeing's interpretation; however, the very existence of the Special Agreement, which we have found to apply to this case, makes the phrase "other things" ambiguous.
 
 
 23
 Western counters Boeing's assertions by arguing that "other things" is limited to those items other than "supplies" and "materials" listed in section 49.2, namely, fabricated work, work in progress and completed work. Western points out by way of hyperbole that if we accept Boeing's all-inclusive definition, Western would be liable to return its phones, mobile offices and many "other things" to Boeing to which it is certainly not entitled. Again, by employing the various canons of construction, we find that Western's definition of "other things" is more reasonable.
 
 
 24
 Were we to adopt Boeing's interpretation of "other things" in light of the express language of the Special Agreement, section 49.7 would unjustly eviscerate the Special Agreement because there is no evidence that Western contemplated that section 49.7 would supersede the Special Agreement based on the ambiguous phrase "other things." Based on the foregoing, we must conclude that section 49 does not apply to the disposition of Vehicles upon a termination for convenience. Rather, because the termination for convenience "concluded" the subcontract after all of the Wings had been activated, the Special Agreement controls the parties' rights relative to the Vehicles.
 
 
 25
 According to the express language of the Special Agreement, title to the Vehicles vested in Western at the conclusion of the subcontract, which we have said occurred when Boeing terminated the contract for convenience. Unfortunately, there was no method agreed to by the parties for calculating the credit owed to Boeing for the Vehicles retained by Western under the facts presented herein. Western contends that a residual value methodology is proper because the parties allegedly agreed to such a methodology during pre-MOA negotiations. Apparently, these negotiations concluded with an agreement that Western would pay Boeing approximately a $1.5 million credit. According to Western, this credit was calculated by taking a residual value agreed upon by the parties and assessed to each type of Vehicle, and then adding the residual values for all of the Vehicles that Western intended to purchase in order to complete the work specified in the MOA.
 
 
 26
 Boeing argues that it did not agree to such a methodology and that permitting Western to pay only the residual value would grant it a windfall because Western was able to sell some of the Vehicles for more than their residual value. However, Boeing agrees that there were pre-MOA negotiations relating to residual values, and Boeing does not contest Western's claim that Boeing would have been entitled to nearly $1.5 million if all the work had been completed. Consequently, if the subcontract had been completed by Western, presumably Boeing would be paid the $1.5 million credit and would have no claim that the residual valuation used to calculate the credit had unjustly rewarded Western.
 
 
 27
 We see no reason why merely because the subcontract was terminated, as opposed to completed, that the residual valuation methodology is now inequitable. To the contrary, we find that this methodology is in keeping with the tenor of the MOA and the parties' prior conduct and therefore is the appropriate way to calculate Boeing's credit. Thus, we reverse the district court and remand for recalculation of Boeing's credit.
 
 
 28
 However, on remand the court must determine whether Western had purchased all of the Vehicles that it needed to complete the final Wing of the project, because if it had, then Boeing is entitled to the full credit of approximately $1.5 million to which the parties had originally agreed. If Western did not buy all of the Vehicles, then the parties should be permitted to present to the district court their calculations based upon the residual valuation methodology.
 
 
 29
 There are two remaining issues on appeal that must also be remanded. First, we find that the court erred when it concluded that a settlement proposal for an adjustment to Wing V was conditioned upon the resolution of the amount due to Boeing for the Wing IV Vehicles. It is undisputed that Boeing attached a cover letter to the proposed Wing V adjustment indicating that the Wings IV and V settlements were so integrated that an agreement on them must be achieved simultaneously. Boeing argues that this supports the court's decision that resolution of the Wing V adjustment was conditioned upon the resolution of the Wing IV settlement.
 
 
 30
 However, the fact that we are even presented with this case belies Boeing's assertion because Boeing does not contest that it owes Western the agreed upon settlement price for the Wing V adjustment. In other words, the parties did in fact agree to a Wing V adjustment despite the fact that they did not settle the Vehicles dispute that precipitated this lawsuit. Consequently, one settlement was not conditioned upon the other. We therefore reverse the district court's holding denying Western prejudgment interest on the Wing V adjustment claim and remand for further proceedings consistent with the following paragraph.
 
 
 31
 What Boeing was truly arguing vis-a-vis the Wing V adjustment issue is that it was entitled to a set-off because the value of the Vehicles exceeded the Wing V adjustment and other monies owed to Western; therefore, prejudgment interest was unavailable to Western. This set-off argument ties in with the second remaining issue on appeal: whether Western is entitled to prejudgment interest on certain liquidated claims. Based on our holding on the Vehicles issue which may result in Western's obtaining more relief than Boeing, we must vacate the district court's ruling on this issue and remand for further proceedings which are governed by York Plumbing & Heating Co. v. Groussman Investment Co., 443 P.2d 986 (Colo.), absent any intervening changes in Colorado law.
 
 
 32
 Accordingly, the decision of the district court is REVERSED in part and VACATED in part, and REMANDED for further proceedings consistent with this opinion.
 
 
 
 *
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 **
 Honorable Richard Owen, United States District Judge for the Southern District of New York, sitting by designation